

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

RICHARD RICHARDSON,

           Plaintiff,

-against-

DETECTIVE DOUGLAS MERRITT, SHIELD #2901,

           Defendant.

------------------------------------------------------------- X

12-CV-5753 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

On June 2, 2014, the instant action proceeded to a bench trial before me. Plaintiff Richard Richardson, proceeding pro se, brings this 42 U.S.C. § 1983 claim against defendant New York Police Department ("NYPD") Detective Douglas Merritt. The claim arises from an incident on November 11, 2012, when defendant ejected plaintiff from the Borough Hall subway station in Brooklyn, New York. Plaintiff alleges that defendant used excessive force in removing him from the station and caused him injuries. He seeks monetary damages.

Having carefully considered the evidence before me, I find that plaintiff has not met his burden of demonstrating that defendant's use of force amounted to a constitutional violation. Accordingly, I hold that defendant is not liable under 42 U.S.C. § 1983.

## BACKGROUND

At trial, the court heard testimony from plaintiff, defendant, and one eyewitness. I will summarize the testimony from each witness that I find most relevant.

1

I.      **Plaintiff's Testimony**

Plaintiff testified that on November 11, 2012, he was sitting at the Borough Hall station singing to himself and watching people go by. He is homeless and had a bag of personal belongings with him. At 7:45 p.m., the 4 train from Manhattan pulled into the station, and defendant got out along with other passengers. Defendant stopped in front of plaintiff and told him, "This ain't no living room." Defendant asked plaintiff what train he was waiting for, and plaintiff replied that he was not waiting for any train. Defendant told plaintiff he would wait with him until he got on the next train. Plaintiff asked defendant if he was angry, and defendant did not reply. Plaintiff testified that defendant smelled of alcohol and appeared unsteady on his feet.

An uptown train came into the station and left, then defendant grabbed plaintiff by the hood of his sweatshirt and pulled him out of his seat. Plaintiff testified that defendant said to him, "Get out of my train station, you God damn homeless blank blank." Plaintiff fell down and told defendant, "Detective, my leg." Defendant grabbed plaintiff again "with force" and pulled him down the platform and up a flight of 18 stairs. Plaintiff continued to complain about his leg, but defendant just laughed and did not respond. At the top of the stairs, defendant pulled plaintiff through the turnstile. Plaintiff fell down in front of the Metropolitan Transit Authority ("MTA") booth. Defendant let go of plaintiff, kept laughing at him, and then ran up another flight of stairs to exit the station. Plaintiff got up and followed defendant up the stairs, exited the station onto Joralemon Street, and saw defendant walking away quickly. Plaintiff called 911 to report the incident, and they transferred him to the NYPD's Internal Affairs Bureau ("IAB"). IAB told plaintiff to wait by the station and that someone would come. Plaintiff waited for about 25 minutes, but no one from IAB came. An NYPD patrol car pulled up and an officer looked at plaintiff but did not say anything.

Plaintiff testified that he saw defendant again "a couple months" later. Plaintiff was riding on the 4 train when defendant got on at the Bergen Street station and approached plaintiff. Defendant apologized to plaintiff and told him that the incident was the result of a bet that defendant had made at a bar at the South Street Seaport. Plaintiff did not ask defendant any questions, and defendant got off at the next stop.

Plaintiff testified that, as a result of the November 11, 2012 incident, he sustained injuries to his right leg, neck, and back. He testified that when defendant pulled him, his right leg became twisted from the knee to the ankle and was painful. He also testified that the back of his neck hurt because defendant had pulled him by the hood. Plaintiff testified regarding the medical treatment he received and submitted medical records from his providers as evidence.

On the same day as the incident, plaintiff went to Kings County Hospital. The records from Kings County Hospital (Pl.'s Ex. 2) state that plaintiff reported that he twisted his right leg when he was "pulled by a cop." A physical examination showed no swelling, wounds, or abrasions to the right leg. The records state that plaintiff voluntarily left. Plaintiff testified that the staff laughed at him when he told them what had happened, so he decided to leave. Plaintiff went to Beth Israel Hospital's emergency room the next day. The records from Beth Israel (Pl.'s Ex. 3) state that plaintiff reported neck, right hip, and right knee pain. Beth Israel gave him Motrin and took x-rays. The x-ray of his right knee showed "narrowing of the medial femoral tibial compartment" and "no fracture or abnormality of alignment." The records state that the findings indicated "[e]arly degenerative changes of the right knee." Beth Israel staff prescribed a painkiller and discharged plaintiff.

Plaintiff testified that he went for a follow-up appointment at Be Well Clinic with Dr. Meyer. The records from Be Well Clinic (Pl.'s Ex. 4) state that Dr. Meyer saw plaintiff for an

initial orthopedic consultation on December 11, 2012, and a re-evaluation on February 5, 2013. Dr. Meyer diagnosed plaintiff with contusions on the spine and right hip, pain in the lower back and right hip, and scoliosis. Dr. Meyer directed plaintiff to rest and use ice packs and warm compresses. Dr. Meyer referred plaintiff for physical therapy and prescribed painkillers. Plaintiff testified that he declined physical therapy because he does not think it is helpful.

Plaintiff testified that he later went to see Dr. Brown at New York-Presbyterian. The records from New York-Presbyterian (Pl.'s Ex 6) state that Dr. Brown saw plaintiff on September 26, 2013, and an MRI of plaintiff's right knee revealed a "horizontal tear of the anterior horn of the lateral meniscus." Plaintiff testified that Dr. Brown told him that he would need surgery, but plaintiff decided to hold off on surgery because he did not think he could take care of his leg after surgery while living on the street.

On cross-examination, when questioned about the degree of force that defendant used, plaintiff testified that defendant grabbed him by the hood and pulled him with one hand. Plaintiff testified that defendant only touched his hood and never touched his body. Plaintiff testified that defendant never punched, kicked, or hit him.

Defendant's counsel also questioned plaintiff on cross-examination regarding the injury to his right knee. Plaintiff testified that he had "no doubt" that defendant caused the meniscus tear in his right knee because he never had the injury before the November 11, 2012 incident. Counsel showed plaintiff medical records from Kings Highway Orthopedic Associates, P.C. (Def.'s Ex. B). The records state that on February 24, 2011, plaintiff told the doctor that that he missed a step while going down the stairs and injured his right knee. The doctor sent him for an MRI, which revealed a large tear in the lateral meniscus of plaintiff's right knee. The doctor initially recommended a course of physical therapy. At follow-up appointments later in 2011, the

4

doctor found that plaintiff's knee had not improved with physical therapy and recommended arthroscopic surgery to be scheduled when plaintiff "is ready with respect to surgical scheduling and timing." Defendant's counsel also showed plaintiff a prior civil complaint that he filed on October 26, 2012 (Def.'s Ex. G). In the complaint, plaintiff wrote that he was bringing suit against the MTA for an incident that occurred on February 18, 2011, when he missed a step going down the stairs at the Broadway Junction subway station. Plaintiff stated that he suffered injuries to his right leg and knee including a "tear in the lateral meniscus." In response to being shown these documents, plaintiff testified that he did have a prior knee injury and had fluid drained from his knee, but he was never told that he needed surgery until after the incident with defendant. He testified that his prior civil complaint referred to a different meniscus tear.

Defendant's counsel also questioned plaintiff about medical records in his Social Security file (Def.'s Ex. A). The records include reports of neck and back pain in 1996, knee and joint pain in 1997, and a right knee injury in 1994. Plaintiff testified that he received these injuries in his prior work as a corrections officer and that his injuries had gotten better until the incident with defendant.

## II. Witness Ellen Hill's Testimony

Plaintiff called as a witness Ellen Hill, an MTA employee who was working in the booth at the Borough Hall station on November 11, 2012. From her post inside the booth, she had a view of the turnstiles and the stairs going out of the station, but she could not see the platform or the stairs going down to the platform.

Hill testified that she saw an officer pulling plaintiff through the turnstile and toward the stairs leading out of the station. She testified that she thought plaintiff was walking in front and

5

the officer was holding him by the hood. She testified that the officer "guided" plaintiff through the turnstile and up the stairs, moving him along but not using a lot of force. She heard the officer tell plaintiff to leave the station and not come back. She testified that plaintiff was not struggling or fighting with the officer.

Hill testified that at some point she turned away briefly because she was speaking to a customer. She testified that she thought plaintiff slipped and fell on the stairs going out of the station. Hill saw plaintiff get up, and both plaintiff and the officer walked up the stairs. At that point, plaintiff was walking on his own and the officer was no longer holding his hood. She testified that she thought plaintiff went up the stairs before the officer.

Hill testified that she did not report the incident because she had no reason to think anyone needed assistance. She also testified that she had seen plaintiff in the station before the incident and had never received complaints about him causing any problems.

### III. Defendant's Testimony

Defendant testified that he has been an NYPD officer for over 21 years and currently works in the transit bureau's special investigations unit. On November 11, 2012, he was working an overtime shift from 4 p.m. to midnight. He rode the subway back and forth between the Bowling Green and Borough Hall stations every hour to monitor the stations and patrol the platforms. He referred to his memo book (Pl.'s Ex. 10) for a record of his patrols.

At around 8 p.m., defendant got off the train at Borough Hall and saw plaintiff sitting on the bench with his leg up and his foot on the seat. He testified that plaintiff was in violation of New York transit regulations.[1] Defendant testified that he had the option to eject plaintiff, issue a

---

[1] Defendant's counsel directed the court's attention to the following provisions of 21 N.Y.C.R.R. 1050.7: "No person on or in any facility or conveyance shall . . . (j)(1) occupy more than one seat on a station, platform or

6

summons, or arrest him. After a short conversation, defendant decided to eject plaintiff from the station because defendant thought the violation was likely to recur. Defendant testified that he also wanted to protect plaintiff's safety because homeless people who fall asleep in train stations can become victims of crimes such as larceny, assault, or robbery.

Defendant testified that he asked plaintiff to put his foot down, then told plaintiff to take his property and leave. He and plaintiff walked side by side down the platform and up the stairs. Defendant noticed plaintiff walking with a limp on his right side. Plaintiff stumbled on the stairs going up from the platform and grabbed defendant's arm. Defendant pulled his arm away and took two steps behind plaintiff to make sure plaintiff could not access his gun. They walked up the stairs and through the turnstiles, then plaintiff walked up the next set of stairs and out of the station. Defendant testified that he never held plaintiff by the hood and that they never had any physical contact, other than the brief moment when plaintiff stumbled and grabbed defendant's arm. Defendant testified that plaintiff never fell. Defendant stayed at the bottom of the steps and watched plaintiff walk up to street level. A few seconds after plaintiff left the station, defendant realized he needed to go to command to replace his radio batteries, so he went up the stairs out of the station as well. He did not see plaintiff outside.

Defendant testified that he saw plaintiff about six months ago at the Borough Hall station but did not speak to him. Defendant denied encountering plaintiff on the 4 train at the Bergen Street stop. He denied apologizing to plaintiff or telling him that he had made a bet at the South Street Seaport. He also testified that he did not drink before or during his shift and that he would face a serious disciplinary violation if he were caught drinking on the job.

---

conveyance when to do so would interfere or tend to interfere with the operation of the authority's transit system or the comfort of other passengers; (2) place his or her foot on a seat on a station, platform or conveyance."

## IV. Parties' Arguments at Trial

Plaintiff asserted that he had every right to be in the Borough Hall station. He argued that the evidence at trial showed that defendant violated his civil rights and caused him a serious injury to his right knee.

Defendant's counsel argued that the evidence at trial did not support a claim of excessive force. Defendant ejected plaintiff from the Borough Hall station because he was violating the transit regulations by placing his foot on the seat and blocking a seat. Defendant's counsel argued that the court should credit defendant's testimony, which established that he escorted plaintiff out of the station without using force. If any incidental force was used, it was not intentional. Defendant's counsel asserted that plaintiff's version of events had numerous inconsistencies. Most significantly, the medical records showed that plaintiff had a meniscus tear before the incident, so it could not have been caused by his encounter with defendant.

## DISCUSSION

### I. Legal Standard

"In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence." Brown v. Lindsay, Nos. 08-CV-351, 08-CV-2182, 2010 WL 1049571, at *12 (E.D.N.Y. March 19, 2010). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." Id. (quoting Fischi v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997)). Under the preponderance of the evidence standard, if the evidence is evenly balanced, the party with the burden of proof loses. Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 731 (2d Cir. 2001).

In order to make out a claim under 42 U.S.C. § 1983, plaintiff must allege (1) that the

challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or the laws of the United States." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)).

Where, as here, a citizen's encounter with a police officer occurs outside the context of an arrest, stop, or seizure, an excessive force claim is analyzed under the Due Process Clause of the Fourteenth Amendment.[2] Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998); see also Webster v. City of N.Y., 333 F. Supp. 2d 184, 196 (S.D.N.Y. 2004). The court must consider whether defendant used a degree of force that "shocks the conscience," based on an analysis of four factors: "(1) The need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of injury inflicted, and (4) whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Tierney v. Davidson, 133 F.3d 189, 199 (2d Cir. 1998) (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

---

[2] Plaintiff was never arrested in connection with this incident, and no Fourth Amendment seizure occurred when defendant ejected plaintiff from the subway station. Courts in this Circuit have repeatedly held that ejection from a public place does not constitute a Fourth Amendment seizure where the plaintiff is free to go anywhere except the place from which he was ejected. See Sheppard v. Beerman, 18 F.3d 147, 153 (2d Cir. 1994) (no Fourth Amendment seizure where court officers escorted plaintiff out of courthouse); Salmon v. Blesser, No. 1:13-cv-1037 (MAD/RFT), 2014 WL 1883552, at *6-*7 (N.D.N.Y. May 12, 2014) (no Fourth Amendment seizure where officer grabbed plaintiff and escorted him out of courthouse); Reeves v. Akinwunmi, No. 07-CV-4964 (RJD), 2008 WL 2114885, at *1 (E.D.N.Y. May 19, 2008) (no Fourth Amendment seizure where officers ejected plaintiff from shelter); Posr v. Killackey, No. 01Civ.2320LTSGWG, 2003 WL 22962191, at *7 (S.D.N.Y. Dec. 17, 2003) (no Fourth Amendment seizure where officers escorted plaintiff out of courthouse); Campbell v. Westchester Cnty., No. 96 Civ. 0467(JSM), 1997 WL 773702, at *4 (S.D.N.Y. Dec. 11, 1997) (no Fourth Amendment seizure where officers ejected plaintiff from hospital). I note, however, that the result would be the same even if the Fourth Amendment standard applied to plaintiff's excessive force claim. The Fourth Amendment prohibits officers from using an unreasonable degree of force. Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010); see Graham v. Connor, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene."). Given the evidence presented at trial, plaintiff could not have met his burden of establishing that defendant used a degree of force that was objectively unreasonable under the circumstances.

## III. Analysis

Applying the four-factor test to the evidence presented at trial, I find that plaintiff did not meet his burden of demonstrating that defendant used a degree of force that "shocks the conscience."

The first two factors consider the need for the use of force and the relationship between the need and the amount of force that was used. In assessing these factors, I do not credit defendant's testimony that he used no force whatsoever to eject plaintiff from the Borough Hall station. Defendant testified that he never held plaintiff by the hood or had any physical contact with plaintiff, other than a brief moment when plaintiff tripped and grabbed defendant's arm. Yet this testimony is inconsistent with the account of Hill, a third-party witness with no stake in the outcome of this litigation. Hill testified that she saw an officer holding plaintiff by the hood and guiding him through the turnstile. Her testimony corroborates plaintiff's testimony that defendant held him by the hood. Therefore, I find sufficient evidence in the record to support the conclusion that defendant held plaintiff by the hood and forcibly moved him out of the station.

The record does not show, however, that defendant used a degree of force that was disproportionate to the need. To be sure, there is no suggestion that plaintiff forcibly resisted defendant, posed a physical threat, or committed any offense other than a minor, non-violent infraction.[3] Even so, by plaintiff's own account he did not want to leave the station, so it is reasonable to assume that some level of physical force might be needed to eject him. Plaintiff has not shown that defendant used more force than necessary to carry out this purpose. Plaintiff conceded at trial that defendant never touched his body, punched him, kicked him, or hit him.

---

[3] Defendant testified that plaintiff tripped on the stairs and grabbed his arm, so defendant moved away to keep plaintiff from accessing his gun. However, I do not find that this testimony in any way suggests that plaintiff posed a threat. Defendant described plaintiff's movement as an inadvertent reaction to stumbling on the stairs. Defendant testified that he moved away as a precautionary measure, not because he had any reason to believe plaintiff was actually trying to get his gun.

10

Instead, he asserted that defendant grabbed him by the hood, pulled him up, and dragged him down the platform, up a flight of stairs, and through the turnstile. Yet Hill, who witnessed part of the encounter, testified that defendant did not use a lot of force. She characterized defendant's movement as "guiding" plaintiff through the turnstile. She also testified that she thought plaintiff was walking in front of the officer, which supports her description that defendant was guiding rather than dragging plaintiff. Considering both Hill's and plaintiff's accounts of the interaction together, I find that plaintiff has not met his burden of proving that defendant used more force than reasonably necessary to eject a person from a place that he did not want to leave.

As to the third factor, plaintiff has not shown that the encounter inflicted a serious injury. The medical records from the day of the incident and the following day reflect that plaintiff reported being in pain, but his providers found no physical signs of injury. An MRI almost a year later showed a meniscus tear in plaintiff's right knee, but the evidence directly contradicts plaintiff's assertion that his encounter with defendant caused this injury. Instead, the medical records convincingly establish that plaintiff previously sustained a tear to his meniscus in a separate incident in February 2011. Indeed, plaintiff filed a civil lawsuit in October 2012 seeking damages for this specific injury. Plaintiff sought to explain this inconsistency by asserting that the prior incident caused a less serious meniscus tear, which required fluid to be drained from his knee. He asserted that the incident with defendant caused a different, more serious tear that caused his doctor to recommend surgery for the first time. This assertion is simply not credible, and it is directly contradicted by the medical records from the 2011 incident showing that his treating physician recommended arthroscopic surgery.

Finally, as to the fourth factor, there is no evidence that defendant maliciously or sadistically used force for the very purpose of causing harm. Plaintiff testified that defendant

11

laughed at him when he fell, and he argued that defendant's statements reflected hostility toward homeless people. At most, he accused defendant of being indifferent to his pain, but he never suggested that defendant took pleasure in harming him.

Taking all of these factors together, I find that plaintiff has not met his burden of establishing that defendant used a degree of force that "shocks the conscience." Based on the corroborating testimony of eyewitness Hill, plaintiff established that defendant held onto plaintiff by his clothing and forcibly ejected him from the subway station. Yet plaintiff did not establish that defendant used more force than necessary to eject a person who did not want to leave. Moreover, plaintiff's medical records from immediately after the incident do not show any physical injuries, and the evidence directly contradicts plaintiff's assertion that defendant caused a meniscus tear to his right knee. Therefore, the evidence at trial does not show that defendant more likely than not used a degree of force that amounts to a constitutional violation.

## CONCLUSION

For the foregoing reasons, I hold that defendant did not use excessive force in violation of the Fourteenth Amendment when ejecting plaintiff from the Borough Hall subway station on November 11, 2012. Thus, defendant is not liable to plaintiff under 42 U.S.C. § 1983. The Clerk of Court is directed to enter judgment for defendant accordingly and close the case.

SO ORDERED.

s/Allyne R. Ross

Allyne R. Ross
United States District Judge

Dated:      June 4, 2014
               Brooklyn, New York

**SERVICE LIST**

Plaintiff
Richard Richardson
Cadman Plaza Post Office
P.O. Box 22886
Brooklyn, NY 11201